SMITH v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.*

Division Two, December 19, 1892.

1. Negligence: RAILROAD: DEMURRER TO EVIDENCE. It is error in an action against a railroad for personal injuries caused by its negligence to refuse to sustain a demurrer to the evidence, when the evidence does not disclose any negligence on the part of the company.

2. ———: ———: ENGINEER. The law imposes upon a railroad engineer the exercise of judgment, skill and diligence in running his engine, and, though he may have the right of way on the track, he ought not to run his train as if no other train were on the road; nor to close his eyes to the hazards of delayed trains, open switches and like matters incidental to the operation of railroads.

3. —— : —— : COLLISION: PRESUMPTION. The mere fact of a collision of trains does not establish a presumption of negligence on the part of the company in favor of its employes, such a presumption existing only in favor of passengers.

4. —— : ——. It is not negligence *per se* for a railroad to have three freight trains reach a station at one time, at which station a passenger train with a right of way is about to pass, provided proper precautions are taken for the safety of the employes and passengers.

*Appeal from Pettis Circuit Court.*

REVERSED.

*H. S. Priest* and *W. S. Shirk* for appellant.

(1) The demurrer to the plaintiff's evidence prayed at the close of her case should have been given. It did not make out a case, and clearly showed such gross contributory negligence on the part of plaintiff's deceased husband as barred a recovery. Nor was it aided by the evidence afterwards introduced by the defendant. Beach on Contributory Negligence, secs. 7, 13; Shearman & Redfield on Negligence, sec. 1, and authorities; *Turner v. Railroad*, 74 Mo. 602; *Weber v. Railroad*, 100 Mo. 194. (2) The demurrer should have been sustained for the further reason that plaintiff below relied entirely upon the fact that Smith's train was not ordinarily required to stop at Lamonte, and hence was entitled to a clear track there, and that it was a negligent act to allow another train to be in his way. This was not sufficient. (3) Plaintiff's first instruction is radically wrong. It furnished the jury no guide as to the measure of damages, but left them to grope in the dark and fix the damages according to their own unrestrained will. This was error. *Parsons v. Railroad*, 94 Mo. 286; *McCowan v. Steel Co.* 16 S. W. Rep. 236; *Schaub v. Railroad*, 16

S. W. Rep. 924. (4) The plaintiff's second instruction is also wrong. There was not a particle of evidence on which to base that part of it, with reference to a failure to give Smith notice that Williams' locomotive occupied the track at Lamonte. The evidence is all the other way, and is uncontradicted and undisputed. It is reversible error to give such instruction. *Miller v. Railroad*, 90 Mo. 389; *Harty v. Railroad*, 95 Mo. 368. (5) It was error to permit plaintiff to testify, against defendant's objection, to the number of her children and age. The damages should be confined to compensation for the wife's loss of her husband. *Stephens v. Railroad*, 96 Mo. 214; *Dayarsh v. Railroad*, 103 Mo. 577. (6) The court should have directed the jury, by giving defendant's instruction as prayed, to find a verdict for the defendant at the close of the whole evidence. (7) Plaintiff's petition is fatally defective. The only negligence alleged, viz., failure to notify Smith of the presence of Williams' engine on the track, is shown to have been the negligence of a fellow servant. (8) Plaintiff is not entitled to recover under any view of the facts disclosed. The cause should not therefore be remanded for a new trial, but simply reversed. *Carroll v. Railroad*, 17 S. W. Rep. 889.

*G. W. Barnett* and *Louis Hoffman* for respondent.

(1) The demurrer to the evidence was properly overruled, besides defendant's evidence supplied any supposed deficiency in plaintiff's evidence. (2) The trains all ran under the direct order of the train dispatcher who ordered the three freight trains out from Sedalia knowing that they would meet a fourth freight train at Lamonte and knowing all these trains would be there in the night time when these two fast passen-

gers would go through.   *Smith v. Railroad*, 92 Mo. 359.
(3) There is  nothing to show contributory negligence
on the part of deceased.   (4) The jury was not bound
to believe defendant's evidence.   *Kennedy v. Holliday*,
25 Mo. App. 517; *Gregory v. Chambers*, 78 Mo. 298;
*Hipsley v. Railroad*, 88 Mo. 348.   (5) The instructions
given for plaintiff were correct.    (6) The conductors
of the freight trains which obstructed the main track
were not fellow servants of deceased, who was an engi-
neer on a passenger train.   *Miller v. Railroad*, 19 S.
W. Rep. 58; *Railroad v. Ackley*, 8 S. W. Rep. (Ky.)
691; *Smith v. Railroad*, 92 Mo. 359; *Railroad v. Herbert*,
116 U. S. 642; *Hough v. Railroad*, 100 U. S. 213; *Rail-
road v. Hoyt*, 9 W. Rep. (Ill.) p. 785; *Railroad v. Ross*,
112 U. S. 377; *Railroad v. O'Brien*, 21 Pac. Rep. 32.
(7) The mere fact of the collision of the two trains on
defendant's road is *prima facie* evidence of negligence
on defendant's part.   Patterson's Railway Accident
Law, sec. 375, pp. 438 and 439.   *Railroad v. Mowery*,
36 Ohio St. 418; *Railroad v. Allbritton*, 38 Miss. 242;
*Smith v. Railroad*, 32 Minn. 1.

GANTT, P. J.—This is an action by the plaintiff,
as a widow of Samuel S. Q. Smith, for damages result-
ing to her from his death, occasioned by the alleged
negligence of the defendant, in whose service he was
employed as locomotive engineer at the time of his
death.

The petition is substantially as follows:   That, on
the night of July 1, 1887, the plaintiff's husband was
running an engine pulling the fast mail train from
Kansas City to Sedalia; that it was a dark and rainy
night; that it was defendant's duty to furnish a safe
track free from obstructions for the passage of said
fast mail train of cars, it being entitled to the right of
the track in preference to all other trains, and that it

was defendant's duty to keep its main track clear and unobstructed by other cars, to allow this train to travel safely; that said fast mail train was not required to stop at the station of Lamonte, but it was the duty of plaintiff's husband to run his train through said town at full speed, and that it was defendant's duty to keep its main track open and free from obstruction, and have no other cars thereon; that on said night, defendant carelessly and negligently caused a train of freight cars to be placed upon the main track at said station of Lamonte, and permitted it to be standing thereon at the time said fast mail was due at said station; that defendant did not notify Smith that said freight train was upon said track, and neglected to send out any signals or lights or notice thereof; that it was a dark night, and there were no lights to indicate where said freight train stood, or that any freight train was there; that said Smith, without any notice or knowledge that said train was there, run his engine into it, and he was killed.

The answer is a general denial and a plea of contributory negligence, directly causing his death.

The plaintiff's evidence consisted of her own evidence and Dr. Walker and Mr. Barnett.

The plaintiff simply testified that she was the widow of Samuel Smith, the deceased engineer; that she had one child, a son four years old; that her husband was an engineer in the employment of the Missouri Pacific Railway Company; that he was brought home dead on the second day of July, 1887, and she was told that he was killed in a wreck of his engine at Lamonte while pulling a passenger train the night before. This was admitted by defendant. Her husband was earning $120 per month. He was forty-one years old and a stout, healthy man.

Dr. Walker testified that he lived at Lamonte. Was a practicing physician. Remembered a wreck at Lamonte on the night of July 1, 1887. Was called to see Smith, the engineer. He only lived about thirty minutes after he reached him. The wreck occurred five hundred yards west of the depot in Lamonte and a few feet west of the west end of the switch. It was a dark rainy night. There are two sidetracks at this · station, one on the south side of the station house or depot, the other on the north side of the depot, both were pretty full of cars at the time of the accident. He was acquainted with the grades of the railroad. He testified it was down grade for three quarters of a mile coming east towards the depot from the west, from a half to three quarters of a mile. A person could see the town from a point about one mile west very distinctly, then as you approach the town you come to a little sag in the road. You can stand at the point of the wreck and see the elevation, but not the road beyond; from Lamonte you can see places beyond the elevation. He testified that passenger trains, like the one deceased was pulling, usually passed the station without stopping unless they had passengers for the station. He also testified, that, standing at the west end of the switch where the accident occurred, you could have seen an engine with a headlight burning a mile distant and an engineer coming from the west could have seen the headlight of an engine standing on the track at the switch for a half mile any way. He had lived in Lamonte ten years, about fifty feet from the railroad track and had never seen a freight go through the town at night without a headlight burning.

Mr. Barnett corroborated Dr. Walker as to the grades. He thought an engineer coming from the west

could see another locomotive at the switch as soon as he reached the summit of the hill beyond Lamonte, a mile and a half distant. "There is nothing to obstruct the view there for some distance west of the west end of the switch, *it is wholly unobstructed for a quarter of a mile.*" This was all of plaintiff's oral evidence.

Plaintiff put in evidence defendant's time-table or schedule in force at the time, under which this passenger train number 4 was running on the Missouri Pacific railroad, showing that the train on which engineer Smith was killed was running as the second section of number 4, and was due in Lamonte at 11:42 (that night), and that trains marked with a red dagger indicated that they did not stop at stations for passengers, and this second section of number 4 was so marked, and showing also that trains or stations marked with large figures denoted meeting and passing of trains and that Lamonte was not so marked with large figures and that the second section of train number 4 was not required by this schedule to stop at Lamonte. That Knobnoster, the station west of Lamonte, was the passing station and the train did not stop after leaving that point till it reached Sedalia. It also appeared that this section was required by schedule to run ten minutes behind the time of the first section, and was running on schedule time, without special orders that night.

Defendant offered a demurrer to the evidence, which was overruled, and defendant excepted.

Thereupon the defendant called Fred Williams, the engineer of the freight train, with which deceased collided, being the third section of freight train number 35. He arrived at Lamonte at 11:15 that night and pulled in on the north switch or passing track; another freight came in and took the south switch; then another freight followed him in on north switch about 11:20. This left, however, about two cars of the last

freight on the main track at the east end of the switch. The first section of passenger train number 4 was due and arrived at Lamonte about 11:34. After it came past the west switch Williams pulled his freight west of the switch on the main track so as to permit section 1 of passenger number 4 to proceed on its way east.

He testified: "Before I pulled onto the main line, I sent out a flagman; he opened the switch and went out west on the track with signals, a flag and a white light; there was an engineer riding with me learning the road, and I also gave him a red lamp, and asked him to follow the head brakeman and give it to him." He saw this man with the red light proceed west on the track until he met the second section of number 4, he judged five hundred to seven hundred yards. The engineer in charge of the second section made no stop, did not notice the signals, and witness jumped from his engine and was caught and disabled for some time. He testifies that the switch signal of danger was shown in addition to the two he sent forward, and that his headlight was burning and that it could be seen for a mile and a half; there was nothing to obstruct the view. He also testified that the second section was only seven or eight minutes behind section 1, instead of ten minutes. His engine carried red lights, danger signals. He testified that the red light at the switch was a signal that the switch was open, and this could have been seen a third of a mile away, and, if Smith, the deceased engineer, had been looking ahead, he could have seen these red lights and could have told the switch was open at least a third of a mile distant, and could have stopped his train at full speed in a quarter of a mile or less. Williams testifies that the grade for a third of mile west of Lamonte, coming east, is an up grade, "a pretty hard grade." He testified that he would have had his train back on the switch in less

than a minute, had begun to move back when he discovered Smith did not intend to stop.

Moses Avery, who had been an engineer thirty-six years and had run an engine over this road for sixteen years, and Thomas Woods, an engineer, who had been on the road twenty years, corroborated Williams in regard to the grade, and the ability to see an engine standing on the track from a mile to a mile and a half distant. They both say that there is a switch signal at Lamonte, and when the switch is open it displays a red light, a signal of danger, which can be seen a third of a mile away. All of the three engineers testified that it was not unusual for more trains to meet at a station than could be put on the switch and side tracks, and in such a case they resorted to this method of sawing by each other.

The following rules for the conduct of trains were shown to have been in force at the time:

Rules of Conductors, Engineers and Trainmen.

"No. 11. All trains and engines must approach stations and water tanks under control, expecting to find another train occupying main track. This applies also to sidings where the view is obstructed and another train is or may be expected. *Engineers will run very carefully by all switches, and see that they are set right.* They will guard against accidents likely to occur from stock being on the track, and, when stock is killed or seriously injured, report the fact to the stock agent or superintendent at the end of the trip, giving him kind of stock and locality as near as possible.

"No. 17. *Passenger trains will pass all stations at which they do not stop at a reduced speed.* Passenger trains will occupy main track at stations where they take meals.

"No. 18. *Trains must not arrive at stations unnecessarily ahead of time, but are expected to use their time*

*in running.* Conductors and engineers of all trains when running under orders must stop at meeting points, and know that the train met is the one specified in the order. Time-table passenger trains meeting a passenger train must learn positively what train it is; and time-table freight trains meeting a freight train must learn positively what train it is."

The defendant, at the close of the case, again requested the court to sustain a demurrer to the evidence, which the court refused. The jury returned a verdict for plaintiff, and defendant appeals.

I. The material and important question in this case is the propriety of refusing the demurrers to the evidence, and we are required to examine the evidence to see if there was sufficient testimony to justify the submission of the case to the jury. Some of the allegations of the petition can be easily disposed of. The averment that this was *"the fast-mail train"* was not sustained by a word of testimony. On the contrary the whole evidence shows that plaintiff's husband was engineer of the second section of the regular passenger train that was running on schedule time and without special orders, and with the failure to prove this was *the fast-mail train,* also fails the allegation dependent upon it, "that the fast mail was entitled to the right of track in preference to all other trains." This averment will not cover any other train, because of its restriction to that train alone, and clearly was not proven as to the train of which deceased was engineer.

Equally unproven is the statement that the deceased was required to go through the town of Lamonte that night *at full speed.* There was no proof tending to prove this fact. There was proof that the train was not required to stop there unless it had passengers for that station, but this is very different from a rule compelling him to go through a station *at full*

*speed.* This part of the petition was drawn with the view that the engineer in charge of the fast mail might disregard the ordinary rules of prudence and caution essential to the safety of every train. No such rule or regulation was offered in evidence, and it is incredible that any company charged with the safe and careful transportation of human beings would promulgate such a rule. In the absence of such rules the law imposes upon every engineer the exercise of judgment, skill and diligence in running his engine. And, though he may have what is termed "the right of way," he is not justified in running his train as if no other train was on the road, nor can he shut his eyes to the fact that at the various stations there are sidetracks and passing tracks, connected by switches to the main track that may be open, and that it must often happen that other trains are delayed from one cause or another, and may be upon his track from unavoidable accident or delays. On the contrary the law requires him to keep a lookout ahead on his track for obstructions and misplaced or open switches. In this case the plaintiff did not show the rules governing engineers in this regard, but the defendant, without objection, did, and these rules expressly required that all passenger trains should pass all stations, at which they were not required to stop, *at a reduced rate of speed*, thus negativing the allegation in the petition that they were required to go through *at full speed.*

The remaining allegations charge that while running said engine on that night, without any warning, he ran into a freight train that had been negligently placed on the main track at Lamonte. It cannot be maintained that it is negligent for the company to send out as many trains as its business and duty to the public requires. Plaintiff's counsel argues that it was negligence *per se* to permit three freight

trains to reach this station of Lamonte at one time. We do not so understand the law. The defendant had a right to run as many trains as the exigencies of its business demanded, provided always it adopted proper regulations in so doing for the protection of its employes. So that the real question in this case is not whether defendant had more trains that night at Lamonte than the sidetracks would conveniently hold and leave the main track unobstructed, but whether when it it was found these trains had all been stopped there and the passenger trains were thus deprived of the right of way intended by the regular schedule, proper precautions were taken for the safety of those running the passenger trains and their passengers.

The evidence in chief, on the part of the plaintiff, tending to show negligence in this regard rested solely in the facts shown that the second section of which plaintiff's husband was engineer was not required by the schedule to stop at this station, unless he had passengers for it, and the fact that the night was dark and rainy, and the fact of the collision with the freight train. Did these facts make a *prima facie* case? We think not.

Suppose this freight train had not reached Lamonte, but owing to some accident to the engine it had been compelled to stop between Dresden and Lamonte, would it have been sufficient for plaintiff to have shown the collision and rested? We hold not. On the contrary it would have devolved upon her to have shown that her husband's train rushed upon it without signals, and her husband neither saw, nor by ordinary care could have seen, the headlight of the freight in time to have saved himself and his train from the collision. Here nothing was shown but the schedule and the collision.

Nor did plaintiff show that her husband came to the station on his schedule time. This is a very significant fact. While he was entitled to a right of way other operatives also aware of his schedule time might well undertake to move their trains, relying on the fact that he would not run ahead of time.

Viewing this evidence altogether and conceding to the plaintiff every inference that can legitimately be drawn from it, we must hold it was insufficient to justify its submission to the jury. Standing alone the facts proven were consistent with an entire absence of negligence on the part of defendant, and by the law of this state negligence is a fact to be alleged and proven. There is no presumption of negligence of the company in favor of its own employee arising from mere proof of the collision. That presumption is in favor of passengers alone, and is based upon public policy. The cases cited by respondent were all passenger cases and are entirely inapplicable to this case.

But the point is made that the defendant's evidence aided the plaintiff's case. That evidence showed, that by the rules trains were forbidden to arrive at stations ahead of time, and "all trains and engines must approach *stations* and water tanks under control, *expecting to find another train occupying the main track.* Engineers will run very carefully by all switches and see that they are set right."

That evidence further showed that Williams, the engineer in charge of the freight train, before pulling his engine out on the main track, knowing that the second section was soon due, sent out his brakeman, who turned the switch signal and displayed a red light, the signal of danger, and this switchman was sent forward to flag the deceased engineer's train. Not only this, but Williams sent another engineer, who was in the cab with him, forward with a red light and saw

this man proceed with this red light right on the track west at least five hundred yards, until the deceased's train forced him to leave the track.   In addition to these signals the freight train stood out on the main track facing west, with a headlight burning.   Two other old engineers, who had run this part of the road from sixteen to twenty years, testified that an engineer coming east could see the headlight of this engine standing at the switch for a mile and a half; that they could see the switch signal for a third of a mile; that they could stop a train at full speed in a quarter of a mile.   The evidence further showed that deceased gave no sign of having seen any of these various signals.   He did not slacken his speed in the slightest, but ran his train at full speed into the freight and was killed.   The evidence also tended to show that he was from two to three minutes ahead of time.

If the deceased had looked ahead of him at any time after leaving the summit of the hill, it is hard to comprehend how he could have failed to see the headlight, and, as he drew nearer, how he could have avoided seeing the switch signal placed there for his protection. It does seem to us that the defendant added nothing whatever to plaintiff's case by its evidence, and the demurrer to the evidence should have been sustained. For refusing to sustain it, the judgment is reversed. All concur.